

# Notice of Service of Process

| | |
|---|---|
| **Primary Contact:** | Richell Mintzlaff MC5003-1001<br>The Boeing Company<br>100 N Riverside<br>Chicago, IL 60606-1596 |
| **Electronic copy provided to:** | Cynthia Pearson |

| | |
|---|---|
| **Entity:** | The Boeing Company<br>Entity ID Number  1901768 |
| **Entity Served:** | The Boeing Company |
| **Title of Action:** | James Edward Moore vs. Curtiss-Wright Corporation |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Asbestos |
| **Court/Agency:** | Newport News Circuit Court, Virginia |
| **Case/Reference No:** | 700CL1703995M-03 |
| **Jurisdiction Served:** | Virginia |
| **Date Served on CSC:** | 11/21/2017 |
| **Answer or Appearance Due:** | 21 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| Sender Information: | Erin E. Jewell<br>757-223-4500 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674   (888) 690-2882   |   sop@cscglobal.com

# COMMONWEALTH OF VIRGINIA



NEWPORT NEWS CIRCUIT COURT
Civil Division
2500 WASHINGTON AVENUE
NEWPORT NEWS  VA  23607
(757) 926-8356

Summons

To: THE BOEING COMPANY
CT CORPORATION SYSTEM
REG AGENT
1111 EAST MAIN STREET
16TH FLOOR
RICHMOND VA 23219

Case No. 700CL1703995M-03

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the clerk's office of this court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment, or decree against such party either by default or after hearing evidence.

Appearance in person is not required by this summons.

Done in the name of the Commonwealth of Virginia on, Wednesday, November 15, 2017

Clerk of Court: GARY S ANDERSON

by _____
(CLERK/DEPUTY CLERK )

Instructions:

Hearing Official:

Attorney's name:     PATTEN WORNOM HATTEN
12350 JEFFERSON AVE, STE 300
757-223-4500
NEWPORT NEWS VA 23602

Uploaded: 2017NOV08 10:31 Filed By: JBLAYLOCK on behalf of Bar# 45447 WHARTY Reference: EF-51926
E-Filed: 2017NOV08 NEWPORT NEWS CC KEDWARDS at 2017NOV08 10:53 CL1703995M-03

VIRGINIA:  IN THE CIRCUIT COURT FOR THE CITY OF NEWPORT NEWS

JAMES EDWARD MOORE

Plaintiff,

v.                                          CIVIL ACTION NO.:

**CURTISS-WRIGHT CORPORATION**
c/o The Corporation Trust Company
1209 Orange Street
Wilmington, DE  19801
SERVE:        Secretary of the Commonwealth
              Patrick Henry Building, 4th Floor
              1111 East Broad Street
              Richmond, VA  23219

**DANA COMPANIES, LLC**
900 W. South Boundary St.
Perrysburg, OH  43551-5244
SERVE:        Secretary of the Commonwealth
              Patrick Henry Building, 4th Floor
              1111 East Broad Street
              Richmond, VA  23219

**EATON CORPORATION**
Parent of Eaton Aeroquip LLC f/k/a Eaton Aeroquip Corp
1111 Superior Ave.
Attn: Tax Dept.
Cleveland, OH  44114
SERVE:        CT CORPORATION SYSTEM
              REGISTERED AGENT
              4701 Cox Road, Suite 285
              Glen Allen, VA  23060

**HAJOCA CORPORATION**
127 Coulter Avenue
Ardmore, PA  19003
SERVE:        CORPORATION SERVICE COMPANY
              REGISTERED AGENT
              1111 East Main Street
              Richmond, VA  23219

1

**HENKEL CORPORATION**
Individually and as successor-in-interest to certain assets of the former
**DEXTER 2 CORPORATION and DEXTER HYSOL AEROSPACE, L.L.C.**
**f/k/a DEXTER HYSOL AEROSPACE, INC.**
200 Elm Street
Stamford, CT 06902-3800
SERVE:          CORPORATION SERVICE COMPANY
                REGISTERED AGENT
                1111 East Main Street
                Richmond, VA  23219


**HONEYWELL INTERNATIONAL, INC.**
101 Columbia Road
PO Box 1057
Morristown, NJ  07962
SERVE:          CORPORATION SERVICE COMPANY
                REGISTERED AGENT
                1111 East Main St., 16th Floor
                Richmond, VA  23219


**IMO INDUSTRIES, INC.**
Individually and as successor-in-interest, parent, alter ego, and equitable trustee to
**ADEL WIGGINS, ADEL FASTENERS, and WIGGINS CONNECTORS**
200 American Metro Blvd., Ste. 111
Hamilton, NJ  08619
SERVE:          CT CORPORATION SYSTEM
                REGISTERED AGENT
                4701 Cox Road, Suite 285
                Glen Allen, VA 23060


**MEGGITT AIRCRAFT SYSTEMS CORPORATION**
Individually and as successor and/or parent to
**AIRCRAFT BRAKING SYSTEMS CORPORATION**
**and AIRCRAFT BRAKING CORPORATION**
1204 Massillon Road
Akron, OH 44306-4188
SERVE:          Secretary of the Commonwealth
                Patrick Henry Building, 4th Floor
                1111 East Broad Street
                Richmond, VA  23219

**METROPOLITAN LIFE INSURANCE COMPANY**
1095 Avenue of the Americas
New York, NY 10036-6796
SERVE:     CT CORPORATION SYSTEM
           REGISTERED AGENT
           4701 Cox Road, Suite 285
           Glen Allen, VA 23060

**NOLAND COMPANY**
3110 Ketterling Blvd.
Dayton, OH 45439
SERVE:     CORPORATION SERVICE COMPANY
           REGISTERED AGENT
           1111 East Main St., 16th Floor
           Richmond, VA 23219

**PARKER-HANNIFIN CORPORATION**
6035 Parkland Blvd.
Corporate Tax Department
Cleveland, OH 44124
SERVE:     CT CORPORATION SYSTEM
           REGISTERED AGENT
           4701 Cox Road, Suite 285
           Glen Allen, VA 23060

**PNEUMO ABEX LLC**
Successor to **ABEX CORPORATION**
Third Street & Jefferson Avenue
Camden, NJ 08104
SERVE:     Secretary of the Commonwealth
           Patrick Henry Building, 4th Floor
           1111 East Broad Street
           Richmond, VA 23219

**R. E. MICHEL COMPANY, INC.**
One R. E. Michel Drive
Glen Burnie, MD 21060
SERVE:     CT CORPORATION SYSTEM
           REGISTERED AGENT
           4701 Cox Road, Suite 285
           Glen Allen, VA 23060

3

**THE BOEING COMPANY,**
Individually and as Successor in Interest to
**McDonnell Douglas Corporation and Boeing North American, Inc.**
100 N. Riverside
Chicago, IL  60606
SERVE:        CORPORATION SERVICE COMPANY
                        REGISTERED AGENT
                        1111 East Main St., 16th Floor
                        Richmond, VA  23219


**THE GOODYEAR TIRE & RUBBER COMPANY**
1144 E. Market Street
Akron, OH  44316
SERVE:        CORPORATION SERVICE COMPANY
                        REGISTERED AGENT
                        1111 East Main St., 16th Floor
                        Richmond, VA  23219


**UNION CARBIDE CORPORATION**
a subsidiary of The Dow Chemical Company
7501 State Highway 185 N
Seadrift, TX  77983
SERVE:        CT CORPORATION SYSTEM
                        REGISTERED AGENT
                        4701 Cox Road, Suite 285
                        Glen Allen, Virginia 23060


**UNITED TECHNOLOGIES CORPORATION**
Individually and d/b/a **PRATT & WHITNEY CO., INC.**
Individually and d/b/a **UTC AEROSPACE SYSTEMS**
10 Farm Springs Road
Farmington, CT  060632
SERVE:        CT CORPORATION
                        REGISTERED AGENT
                        4701 Cox Road, Suite 285
                        Glen Allen, VA 23060


**WACO, INC.**
5450 Lewis Road
Sandston, VA  23150
SERVE:        DANIEL M. WALKER
                        REGISTERED AGENT
                        5450 Lewis Road
                        Sandston, VA  23150

4

**WYETH HOLDINGS CORPORATION**
As successor in interest to **AMERICAN CYANAMID COMPANY**
Five Giralda Farms
Madison, NJ  07940
SERVE:          CT CORPORATION
                REGISTERED AGENT
                4701 Cox Road, Suite 301
                Glen Allen, VA 23060

                Defendants.

5

## COMPLAINT

NOW COMES JAMES EDWARD MOORE, a resident of the State of South Carolina, alleges as follows:

1.      This action is subject to the Standing Orders entered in the Circuit Court for the City of Newport News in regards to asbestos cases filed by the firm of Patten, Wornom, Hatten & Diamonstein, L.C.

2.      As used hereafter, the term "asbestos-containing product" will be used to identify collectively: (i) raw asbestos fiber, (ii) end products directly incorporating asbestos fiber, and (iii) end products manufactured, assembled or supplied by a defendant who has specified and/or required raw asbestos and/or products incorporating asbestos manufactured or supplied by others, to be used, whether internally or externally, in conjunction with the end product for the routine maintenance, repair, and/or proper and intended use and operation of the end product.

3.      The Plaintiff JAMES EDWARD MOORE was born in 1936.

4.      The Plaintiff JAMES EDWARD MOORE served in the United States Air Force from 1954 to 1982, including at Langley Air Force Base in Virginia, in various capacities related to the maintenance, repair and operation of military aircraft, including but not limited to aircraft mechanic, assistant crew chief, crew chief, maintenance crew chief, flight line supervisor, flight engineer and flight engineer tech.  It is believed that JAMES EDWARD MOORE was exposed to asbestos dust, fibers and/or particles during this employment.

5.      On or about February 17, 2017, JAMES EDWARD MOORE was diagnosed with malignant mesothelioma, a terminal cancer caused by his exposure to asbestos dust, fibers, and/or particles.

6.      The Defendants are corporations, companies or other business entities which, during all times material hereto, and for a long time prior thereto, have been, and/or are now

engaged, directly or indirectly, in the manufacturing, producing, selling, merchandising, supplying, distributing, incorporating, and/or otherwise placing in the stream of commerce, asbestos products and/or products whose sole purpose is to cut, score and/or grind asbestos-containing products.  Courts of the Commonwealth of Virginia have personal jurisdiction over all Defendants.

7. At all times material hereto, Defendants acted through their agents, servants or employees who were acting within the scope of their employment on the business of the Defendants.

8. At all times material hereto:

(a). Defendant, CURTISS-WRIGHT, a Delaware corporation, manufactured, produced, distributed, sold and/or supplied, either directly or indirectly, to the Plaintiff, to the Plaintiff's employer, and/or to others for use on the jobsite where Plaintiff performed his job duties, asbestos-containing products, including, without limitation, aircraft engines and/or associated systems which incorporated and/or required the use of asbestos-containing products including, without limitation, asbestos-containing gaskets and/or packing.

(b). Defendant, DANA COMPANIES, LLC, an Ohio company, and as successor to the former DANA CORPORATION which was the successor in liability to Smith & Kanzler and through Dana's Victor Product Division, both manufactured, produced, distributed, sold and/or supplied, either directly or indirectly through its predecessor corporation, to the Plaintiff, the Plaintiff's employer, and/or to others for use on the jobsite where Plaintiff performed his job duties, asbestos-containing products including, without limitation, asbestos-containing gaskets.

(c). Defendant, EATON CORPORATION, as parent to EATON AEROQUIP LLC, f/k/a Eaton Aeroquip Corp., and an Ohio corporation, manufactured, produced, distributed,

sold and/or supplied, either directly or indirectly, to the Plaintiff, to the Plaintiff's employer, and/or to others for use on the jobsite where Plaintiff performed his job duties, asbestos-containing products, including, without limitation, electrical equipment and/or components which by their design required the use of asbestos containing products. This Defendant also incorporated, specified, required or reasonably foresaw that its equipment would be insulated with asbestos-containing materials on their exterior.

(d).     Defendant, HAJOCA CORPORATION, a Maine corporation sold, distributed and/or supplied, either directly or indirectly, to the Plaintiff, to the Plaintiff's employer, and/or to others for use on the jobsite where Plaintiff performed his job duties, asbestos-containing products including, without limitation, pipecovering sections, block, cement and textiles manufactured by different companies.

(e).     Defendant HENKEL CORPORATION, a Delaware corporation, individually and as successor in to certain assets of the former DEXTER 2 CORPORATION and DEXTER HYSOL AEROSPACE, L.L.C. f/k/a DEXTER HYSOL AEROSPACE, INC., manufactured and sold, either directly or indirectly, to the Plaintiff, to the Plaintiff's employer, and/or to others for use on the jobsite where Plaintiff performed his job duties, asbestos-containing products including, without limitation, adhesives, epoxies, sealants and/or other asbestos-containing products.

(f).     Defendant, HONEYWELL INTERNATIONAL INC., successor to ALLIED-SIGNAL, INC., formerly ALLIED CORPORATION (as successor in interest to BENDIX CORPORATION), a Delaware Corporation, manufactured and sold, either directly or indirectly, to the Plaintiff, to the Plaintiff's employer, and/or to others for use on the jobsite where Plaintiff performed his job duties, asbestos-containing products including, without

8

limitation, brake pads, brake linings, brake assemblies, and/or other asbestos-containing products.

(g).    Defendant, IMO INDUSTRIES, INC., a Delaware corporation, individually and as successor-in-interest, parent, alter ego, and equitable trustee to ADEL WIGGINS, ADEL FASTENERS, and WIGGINS CONNECTORS, manufactured, specified, produced, distributed and/or sold, either directly or indirectly, to the Plaintiff, to the Plaintiff's employer, and/or to others for use on the jobsite where Plaintiff performed his job duties, asbestos-containing products including, without limitation, fasteners and/or connectors, repair and/or replacement material including asbestos-containing packing.

(h).    Defendant, MEGGITT AIRCRAFT BRAKING SYSTEMS CORPORATION, an Ohio corporation and successor and/or parent to AIRCRAFT BRAKING SYSTEMS CORPORATION and AIRCRAFT BRAKING CORPORATION, manufactured, specified, produced, distributed and/or sold, either directly or indirectly, to the Plaintiff, to the Plaintiff's employer, and/or to others for use on the jobsite where Plaintiff performed his job duties, asbestos-containing products including, without limitation, brakes system components including but not limited to anti-skid brakes and systems and hydraulic brakes, landing gear components, brake temperature sensors, main and nose wheels, wheel speed transducers, various monitoring units, and/or repair and/or replacement materials which by their design required the use of asbestos containing products.

(i).    Defendant, METROPOLITAN LIFE INSURANCE COMPANY, a New York corporation authorized to do business in the Commonwealth of Virginia, has its principal place of business at 1 Madison Avenue, New York, New York 10010. This defendant did not manufacture, sell or distribute asbestos-containing products, but this defendant acted in conspiracy with other defendants as set forth below in Count III.

9

(j). Defendant, NOLAND COMPANY, a Virginia corporation, sold, distributed and/or supplied, either directly or indirectly, to the Plaintiff, to the Plaintiff's employer, and/or to others for use on the jobsite where Plaintiff performed his job duties, asbestos-containing products including, without limitation, pipecovering sections, block, cement and/or textiles manufactured by different companies.

(k). Defendant, PARKER-HANNIFIN CORPORATION, an Ohio Corporation, manufactured, specified, produced, distributed and/or sold, either directly or indirectly, to the Plaintiff, to the Plaintiff's employer, and/or to others for use on the jobsite where Plaintiff performed his job duties, without limitation, brake pads, brake assemblies, and/or other asbestos-containing products.

(l). Defendant, PNEUMO ABEX LLC, successor to ABEX CORPORATION, was the exclusive manufacturer of asbestos-containing brake products sold by the National Auto Parts Association (NAPA) through its affiliated stores and thereby sold directly or indirectly to the Plaintiff, to the Plaintiff's employer, and/or to others for use on the jobsite where Plaintiff performed his job duties, without limitation, brake pads, brake assemblies, and/or other asbestos-containing products.

(m). Defendant, R. E. MICHEL COMPANY, INC., a Maryland corporation, sold, distributed and/or supplied, either directly or indirectly, to the Plaintiff, to the Plaintiff's employer, and/or to others for use on the jobsite where Plaintiff performed his job duties, various asbestos-containing products as that term is defined above including, without limitation, cements, asbestos-containing packing as defined above, insulation and/or refractory products manufactured by various companies.

(n). Defendant, THE BOEING COMPANY, a Delaware corporation, individually and as successor in interest to McDonnell Douglas Corporation and Boeing North

10

American, Inc., manufactured, produced, distributed, sold and/or supplied, either directly or indirectly, to the Plaintiff, to the Plaintiff's employer, and/or to others for use on the jobsite where Plaintiff performed his job duties, aircraft and/or associated aircraft systems which incorporated and/or required the use of asbestos-containing products including, without limitation, asbestos-containing gaskets, brakes, clutches, clamps, landing gear, adhesives & epoxier, sealants, heat shields, insulation. and/or packing.

(o).    Defendant, THE GOODYEAR TIRE & RUBBER COMPANY, an Ohio corporation, manufactured, produced, sold, distributed, and/or supplied, either directly or indirectly, to the Plaintiff, to the Plaintiff's employer, and/or to others for use on the jobsite where Plaintiff performed his job duties, asbestos-containing products including, without limitation, brake pads, brake assemblies, and/or other asbestos-containing products.

(p).    Defendant, UNION CARBIDE CORPORATION, a New York corporation, manufactured, produced, distributed, sold and/or supplied, either directly or indirectly, to the Plaintiff, to the Plaintiff's employer, and/or to others for use on the jobsite where Plaintiff performed his job duties, asbestos-containing products including, without limitation, electrical products, plasters, and asbestos resins such as General Purpose Bakelite, Heat Resistant Bakelite, High Impact Heat Resistant Bakelite, Bakelite Molding Compound. This Defendant also sold and/or distributed bulk quantities of raw asbestos fibers mined from the Calidria Mines to many of the defendants listed herein for incorporation into their asbestos-containing products under various trade names.

(q).    Defendant, UNITED TECHNOLOGIES CORPORATION, a Delaware corporation, Individually and d/b/a PRATT & WHITNEY CO., INC., Individually and d/b/a UTC AEROSCPACE SYSTEMS, manufactured, produced, distributed, sold and/or supplied, either directly or indirectly, to the Plaintiff, to the Plaintiff's employer, and/or to others for use

11

on the jobsite where Plaintiff performed his job duties, aircraft engines and/or associated systems which incorporated and/or required the use of asbestos-containing products including, without limitation, asbestos-containing gaskets, insulation, heat shields, raw asbestos, clamps and/or packing.

(r). Defendant, WACO, INC., a corporation incorporated under the rules of Virginia having its corporate offices at 814 Chapman Way, Newport News, Virginia, and a successor to WACO INSULATION, INC, sold, distributed and/or supplied, either directly or indirectly, to the Plaintiff, to the Plaintiff's employer, and/or to others for use on the jobsite where Plaintiff performed his job duties, various asbestos-containing products including, without limitation, construction and/or repair products like pipecovering sections, block, cement and textiles manufactured by different companies.

(s). Defendant WYETH HOLDINGS CORPORATION, as successor in interest to AMERICAN CYANAMID COMPANY, a Maine corporation, sold, distributed and/or supplied, either directly or indirectly, to the Plaintiff, to the Plaintiff's employer, and/or to others for use on the jobsite where Plaintiff performed his job duties, adhesive film used on aircraft.

9. During Plaintiff's employment as described in paragraph No. 5 above, JAMES EDWARD MOORE was exposed to and inhaled asbestos dust, fibers and/or particles generated from the ordinary and foreseeable use of the asbestos-containing products as that term is defined above manufactured, sold, supplied, distributed, incorporated, and/or otherwise placed in the stream of commerce by the Defendants, which all proximately resulted in the Plaintiff contracting malignant mesothelioma, which is permanent and/or fatal.

(Space Intentionally Blank)

12

## COUNT I - NEGLIGENCE

10. The Plaintiff hereby incorporates by reference Paragraphs One (1) through Ten (10) inclusive, as if the same were hereto set forth at length.

11.. At all times material hereto, the Plaintiff JAMES EDWARD MOORE was not aware of the nature and extent of the danger to his respiratory system, heart, other bodily parts, and general health that would result from his contact with, exposure to and inhalation of the asbestos dust, fibers and/or particles resulting from the intended, ordinary and foreseeable use of the Defendants' asbestos-containing products; whereas, each of the Defendants knew, had reason to know, should have known and/or could have reasonably determined that the Plaintiff JAMES EDWARD MOORE would inhale asbestos dust, fibers and/or particles during or as a consequence of the intended, ordinary and foreseeable use of their asbestos-containing products, and despite such facts, Defendants, individually, jointly, and severally were negligent in one or more of the following respects:

(a). Mined, manufactured, sold, distributed, incorporated and/or otherwise placed in the stream of commerce asbestos-containing products, which Defendants knew or in the exercise of ordinary care should have known, and/or had reason to know, were imminently and inherently dangerous, otherwise highly harmful and defective without a proper warning calculated to reach the Plaintiff JAMES EDWARD MOORE and others exposed to asbestos dust, fibers and/or particles resulting from the intended, ordinary and foreseeable use of their asbestos-containing products;

(b). Failed to take reasonable precautions or to exercise reasonable care to adequately or sufficiently warn the Plaintiff JAMES EDWARD MOORE of the dangers and harm to which he was exposed as a consequence of the inhalation of asbestos dust, fibers and/or particles resulting from the intended, ordinary and foreseeable use of their asbestos-containing

products;

(c). Failed and omitted to provide the Plaintiff JAMES EDWARD MOORE with the knowledge of reasonably safe and sufficient safeguards, wearing apparel, proper safety equipment and appliances needed to protect him from being injured, disabled, killed, or otherwise harmed by working with, using, handling, coming into contact with, and inhaling the asbestos dust, fibers and/or particles resulting from the intended, ordinary and foreseeable use of their asbestos-containing products;

(d). Failed to place any warnings or adequate and sufficient warnings on or inside the containers of their asbestos-containing products and to suitably apprise the Plaintiff JAMES EDWARD MOORE of the risks and dangers inherent in the intended, ordinary and foreseeable use of their asbestos-containing products and the precautions necessary to make their asbestos-containing products safe for their intended, ordinary and foreseeable uses;

(e). Failed to place any warnings or adequate and sufficient warnings on or inside the packaging of their asbestos-containing products, or otherwise, to inform the Plaintiff JAMES EDWARD MOORE or any foreseeable user, of the dangers inherent in the repair and replacement of such asbestos-containing products, which repair and replacement foreseeably required the removal of friable and inherently dangerous asbestos-containing products and materials.

(f). Failed to place warnings, or adequate and sufficient warnings on or inside the containers of their asbestos-containing products, or in technical manuals, drawings or specifications supplied with their asbestos-containing products to inform the Plaintiff JAMES EDWARD MOORE of the enhanced risk and dangers inherent in the intended, ordinary and foreseeable use of their asbestos-containing products in the environment of industrial and/or commercial activities where the Defendants knew, should have known and/or had reason to

know that many other asbestos-containing products were also being dangerously and simultaneously used without controls of safety procedures;

(g). Failed to adequately test their asbestos-containing products to determine the nature and extent of the risk from the foreseeable use, maintenance, repair and/or removal of their products and the need for warnings and recommended safety instructions to eliminate or reduce that risk;

(h). Failed to advise the Plaintiff JAMES EDWARD MOORE, whom the Defendants knew, should have known, and/or had reason to know, was exposed to asbestos dust, fibers and/or particles resulting from the intended, ordinary and foreseeable use of their asbestos-containing products, to cease all future exposure to asbestos dust, fibers and/or particles, to be examined by a lung specialist to determine the nature and extent of any and all asbestos diseases caused by such exposure, and to receive treatment for such diseases.

12.. Such negligent and deliberate acts of the Defendants proximately resulted in the Plaintiff's long-term inhalation of asbestos dust, fibers and/or particles from the intended, ordinary and foreseeable use of Defendants' asbestos-containing products, including the routine, recommended and expected maintenance of the Defendants' asbestos-containing products, and this exposure directly and proximately caused the Plaintiff JAMES EDWARD MOORE to contract malignant mesothelioma, which is permanent and/or fatal.

13.. The Defendants' foregoing acts, failures and/or omissions were willful or wanton in nature, were undertaken with actual or constructive knowledge that injury would result, and/or were accomplished with such recklessness as to evince a conscious disregard for the health, safety, and rights of JAMES EDWARD MOORE.

(Space Intentionally Blank)

15

## COUNT II - BREACH OF IMPLIED WARRANTY

14..    The Plaintiff hereby incorporates by reference Paragraphs One (1) through Fourteen (14) inclusive, as if the same were hereto set forth at length.

15..    Defendants impliedly warranted that their asbestos-containing products were reasonably fit for use and safe for their intended purposes.

16.    At the time of the manufacture, incorporation and/or sale of their asbestos-containing products to the to the Plaintiff, to the Plaintiff's employer, and/or to others for use on the jobsite where Plaintiff performed his job duties, the Defendants knew, should have known and/or had reason to know, that JAMES EDWARD MOORE, was a person whom the Defendants might reasonably have expected to use, consume, or by affected by their asbestos-containing products.

17.    Throughout the years that the Plaintiff JAMES EDWARD MOORE was exposed to Defendants' asbestos-containing products, the Defendants expected that their asbestos-containing products would reach, and they in fact did reach, the ultimate user or consumer without substantial change in the condition in which they were sold.

18.    The Defendants' asbestos-containing products were sold in a defective condition in that they were incapable of being made safe for their intended, ordinary and foreseeable use, and said Defendants failed to give adequate or sufficient warnings or instructions about the unreasonable risks and dangers inherent in their asbestos-containing products.

19.    Defendants breached said warranties to the Plaintiff JAMES EDWARD MOORE in that their asbestos-containing products were imminently and inherently dangerous, defective, hazardous, unfit for use, not properly merchantable, and not safe for their intended, ordinary and foreseeable uses and purposes and such breaches proximately resulted in the Plaintiff JAMES EDWARD MOORE contracting malignant mesothelioma, which is permanent and/or fatal.

16

20.     The Defendants' foregoing acts, failures and/or omissions were willful or wanton in nature, were undertaken with actual or constructive knowledge that injury would result, and/or were accomplished with such recklessness as to evince a conscious disregard for the health, safety, and rights of JAMES EDWARD MOORE.

(Space Intentionally Blank)

17

## COUNT III – CONSPIRACY

21.     The Plaintiff hereby incorporates by reference Paragraphs One (1) through Twenty-One (21), inclusive, as if the same were hereto set forth at length.

22.     Defendants, and Metropolitan Life Insurance Company, individually, jointly, in conspiracy with each other, and as an industrial and trade association or group for many decades have been possessed of medical and scientific data which clearly indicated that the inhalation of asbestos dust and fibers resulting from the intended, ordinary and foreseeable use of their asbestos-containing products were imminently, inherently and unreasonably dangerous, carcinogenic, and potentially deadly.

23..     Despite the medical and scientific data possessed by and available to them, the Defendants, prompted by pecuniary motives, individually, jointly, and in conspiracy with each other, fraudulently, willfully, deliberately, maliciously and callously:

(a).     Ignored, withheld, and/or actively concealed said medical and scientific data from the public, and particularly persons like the Plaintiff JAMES EDWARD MOORE, who were using and/or being exposed to their asbestos-containing products and to the inhalation of the asbestos dust and fibers resulting from the intended, ordinary and foreseeable use of their asbestos-containing products;

(b).     Caused to be released, published, and/or disseminated data and reports containing the dangers of their asbestos-containing products, which data and reports they knew, should have known, had reason to know, and/or could have reasonably been determined to be incorrect, incomplete, outdated, and misleading;

(c).     Deliberately chose to provide patently inadequate and ambiguous warnings and intentionally failed to warn of the known dangers when finally, compelled by the state of medical art to provide notice of the dangers of their asbestos-containing products and the

18

inhalation of asbestos dust and fibers resulting from the intended, ordinary and foreseeable use of their asbestos-containing products;

(d). Distorted, and/or caused to be misdiagnosed, the results of medical examinations conducted upon persons and workers like the Plaintiff JAMES EDWARD MOORE who were using and handling said asbestos-containing products and being exposed to the inhalation of asbestos dust and fibers resulting from the intended, ordinary and foreseeable use of their asbestos-containing products; and

(e). Refused and failed to test their asbestos-containing products, and/or tested their asbestos-containing products and willfully concealed or refused to publish adverse test results, or distorted said adverse test results so that the public persons such as the Plaintiff JAMES EDWARD MOORE were misled into believing the test results were not adverse.

24. Defendants, individually, jointly, and in conspiracy with each other, participated in the fraudulent scheme described in Paragraphs Twenty-Three and Twenty-Four (23 & 24) above, to keep the Plaintiff JAMES EDWARD MOORE in ignorance of his rights by fraudulently concealing the nature and extent of the harm which he has suffered as a result of using and being exposed to the Defendants' asbestos-containing products and by fraudulently concealing that this harm was the direct and proximate result of the occupational use and exposure to the Defendants' asbestos-containing products and the inhalation of asbestos dust and fibers resulting from the intended, ordinary and foreseeable use of said asbestos-containing products, and, in fact, said fraudulent scheme did keep the Plaintiff JAMES EDWARD MOORE in ignorance of his rights.

25. Defendants, individually, jointly, and in conspiracy with each other intended, by the fraudulent misrepresentations and omissions as set forth in Paragraphs Twenty-Three and Twenty-Four (23 & 24) above, to induce the Plaintiff JAMES EDWARD MOORE to rely upon

19

said fraudulent misrepresentations and omissions and to continue to expose himself to the dangers that the Defendants knew to be inherent in the use of and exposure to their asbestos-containing products and the inhalation of the asbestos dust and fibers resulting from the intended, ordinary and foreseeable use of said asbestos-containing products without warning to the Plaintiff JAMES EDWARD MOORE of these dangers, thereby depriving him of the opportunity of informed free choice as to whether to continue to use such asbestos-containing products and to expose himself to these dangers.

26.      Defendants, individually, jointly, in conspiracy with each other, and through trade associations in which they were members, maliciously, willfully, callously, and deliberately:

(a).      Exposed and continued to expose the Plaintiff JAMES EDWARD MOORE to the risks and dangers of asbestosis, mesothelioma, scarred lungs, cancer, and other illnesses and damage to various organs of the body, including injury to tissue and bone, all of which risks Defendants knew, should have known, had reason to know and/or could have reasonably determined;

(b).      Failed to test and continue to test their asbestos-containing products regarding the risks and dangers to persons who use or were exposed to their asbestos-containing products and the inhalation of the asbestos dust and fibers resulting from the intended, ordinary and foreseeable use of said asbestos-containing products;

(c).      Ignored medical and scientific data regarding the risks of asbestosis, scarred lungs, cancer, mesothelioma, and other illnesses to workers like the Plaintiff JAMES EDWARD MOORE who used or were exposed to their asbestos-containing products and the inhalation of the asbestos dust and fibers resulting from the intended, ordinary and foreseeable use of said asbestos-containing products;

(d).      Sought methods to ignore or defeat Workmen's Compensation and other

claims of workers like the Plaintiff who suffered from illnesses or diseases from use of or exposure to their asbestos-containing products and the inhalation of the asbestos dust and fibers resulting from the intended, ordinary and foreseeable use of said asbestos-containing products;

(e).    Attempted to discredit scientists, doctors, writers, and medical literature who or which indicated, demonstrated, or established a relationship between illness and disease from the use of and exposure to their asbestos-containing products and the inhalation of the asbestos dust and fibers resulting from the intended, ordinary and foreseeable use of said asbestos-containing products;

(f).    Refused to conduct research on the relationship between asbestos exposure and disease because pecuniary motives of profit were followed at the expense of human lives;

(g).    Sought to create favorable publicity about asbestos-containing products for pecuniary motives when they knew of their risks and dangers;

(h).    Failed to seek safe substitute products for asbestos for pecuniary motives of profit at the expense of human lives;

(i).    Misled the public and workers such as the Plaintiff who used or were exposed to their asbestos-containing products and indicated that their asbestos-containing products were safe in their intended, ordinary and foreseeable uses;

(j).    Concealed the existence of tests, data, literature, and medical reports regarding the causal relationship of asbestos to cancer, mesothelioma, scarred lungs, asbestosis, respiratory disorders and other illnesses;

(k).    Refused to authorize testing and research involving the relationship of illness and disease to exposure to, use of, and inhalation of the asbestos dust and fibers resulting from the intended, ordinary and foreseeable use of their asbestos-containing products fearing

adverse publicity would affect the highly profitable market of asbestos sales;

(l).    Chose to rely on inaccurate or insufficient medical and scientific research or data regarding the causal relationship between asbestos-containing products and disease in order to avoid any possible adverse publicity that would affect sales of their asbestos-containing products; and

(m).    Failed to place adequate or proper warnings on their asbestos-containing products fearing that such warnings would adversely affect sales.

27.    Defendants as specifically identified below, individually and as agents of one another and as co-conspirators, agreed and conspired among themselves and with other asbestos manufacturers and distributors to injure JAMES EDWARD MOORE in the following fashion:

(a).    Beginning in approximately 1934, conspirator Johns-Manville Corporation, through its agents, Vandiver Brown and attorney J.C. Hobart, and conspirator Raybestos-Manhattan, through its agents, Sumner Simpson and J. Rohrbach, suggested to Dr. Anthony Lanza, Associate Director, Metropolitan Life Insurance Company (insurers of Manville and Raybestos), that Lanza publish a study on asbestosis in which Lanza would affirmatively misrepresent a material fact about asbestos exposure:  that is, the seriousness of the disease process, asbestosis.  This was accomplished through intentional deletion of Lanza's description of asbestosis as "fatal" and through other selective editing that affirmatively misrepresented asbestosis as a disease process less serious than it actually is and was known to be then.  As a result, Lanza's study was published in the medical literature in this misleading fashion in 1935. The conspirators were motivated, in part, to effectuate this fraudulent misrepresentation and fraudulent nondisclosure by the desire to influence proposed legislation to regulate asbestos exposure and to provide a defense in lawsuits involving Manville, Raybestos and Metropolitan Life, as insurer;

(b).    In 1936, conspirators American Brake Block Corporation, Asbestos Manufacturing Company, Gatke Corporation, Johns-Manville Corporation, Keasby & Mattison Company (then an alter ego to conspirator Turner & Newall), Raybestos-Manhattan, Russell Manufacturing (whose liabilities have been assumed by H.K. Porter Company), Union Asbestos and Rubber Company and United States Gypsum Company, entered into an agreement with the Saranac Laboratories.   Under this agreement, these conspirators acquired the power to decide what information Saranac Laboratories could publish about asbestos disease and could also control in what form such publications were to occur.   This agreement gave these conspirators power to affirmatively misrepresent the results of the work at Saranac, and also gave these conspirators power to suppress material facts included in any study.   On numerous occasions thereafter, the conspirators exercised their power to prevent Saranac scientists from disclosing material scientific data, resulting in numerous misstatements of fact being made at scientific meetings;

(c).    On November 11, 1948, representatives of the following conspirators met at the headquarters of Johns-Manville Corporation:   American Brake Block Division of American Brake and Shoe Foundry, Gatke Corporation, Keasby & Mattison Company (then an alter ego to conspirator Turner & Newall), Raybestos-Manhattan, Inc., Thermoid Company (whose assets and liabilities were later purchased by H.K. Porter Company), Union Asbestos and Rubber Company and United States Gypsum Company.   U.S. Gypsum did not send a representative to the meeting, but instead authorized Vandiver Brown of Johns-Manville to represent its interest at the meeting and to take action on its behalf;

(d).    At this November 11, 1948 meeting, these Defendants and their representatives decided to exert their influence to materially alter and misrepresent material facts about the substance of research started by Dr. Leroy Gardner at the Saranac Laboratories

beginning in 1936. Dr. Gardner's research involved the carcinogenicity of asbestos in mice and also included an evaluation of the health effects of asbestos on humans with a critical review of the then-existing standards of dust exposure for asbestos and asbestos-containing products;

(e).    At this meeting, these Defendants intentionally and affirmatively determined that Dr. Gardner's work should be edited to specifically delete material facts about the cancer-causing propensity of asbestos and the health effects of asbestos on humans and the critique of the dust standards and then published same in the medical literature as edited by Dr. Vorwald. These Defendants thereby fraudulently misrepresented the risks of asbestos exposure to the public, in general, and the class of persons exposed to asbestos, including the Plaintiff;

(f).    As a direct result of influence exerted by the above-described conspirators, Dr. Vorwald published Dr. Gardner's edited work in the Journal of Industrial Hygiene, AMA Archives of Industrial Hygiene and Occupational Health in 1951 in a form that stressed those portions of Dr. Gardner's work that the conspirators wished stressed, but which omitted references to human asbestosis and cancer, thereby fraudulently and affirmatively misrepresenting the extent of the risks. The conspirators affirmatively and deliberately disseminated this misleading Vorwald publication to university libraries, government officials, agencies and others;

(g).    Such action constituted a material affirmative misrepresentation of the total context of material facts involved in Dr. Gardner's work and resulted in creating an appearance that inhalation of asbestos was less of a health problem than Dr. Gardner's unedited work indicated;

(h).    The following conspirators were members of the trade association known as Quebec Asbestos Mining Association (Q.A.M.A.): Johns-Manville Corporation, Carey-Canada, individually and as successor to Quebec Asbestos Corporation, the Celotex Corporation,

successor to Quebec Asbestos Corporation, the National Gypsum Company, and Turner & Newall, individually and successor to Bell Asbestos. These conspirators, members of Q.A.M.A., participated in the above-described misrepresentation of the work of Dr. Leroy Gardner published by Arthur Vorwald in the AMA Archives of Industrial Health in 1951. Evidence of the Q.A.M.A.'s involvement in this misrepresentation arises from co-conspirator Johns-Manville's membership in the Q.A.M.A., as well as correspondence from co-conspirators dated 10/29/47, 11/26/47, 3/6/48, 10/15/48, 3/8/49, 9/6/50, and 3/21/51, and all indicating close monitoring of the editing process of Q.A.M.A.'s representative, Ivan Sabourin, acting on behalf of all Q.A.M.A. members;

(i).    Defendants who were members of the Q.A.M.A. as described above, began in or about 1950 to formulate a plan to influence public opinion about the relationship between asbestos and cancer by influencing the medical literature on this subject and then touting and disseminating this literature to the public and to organizations and legislative bodies responsible for regulatory control of asbestos with the specific intent of misrepresenting the existing scientific information and suppressing contrary scientific data in their possession and control;

(j).    This plan of misrepresentation and influence over the medical literature began on or about 1950 when the aforementioned Q.A.M.A. members selected Saranac Laboratories to do an evaluation of whether cancer was related to asbestos. After a preliminary report authored by Arthur Vorwald in 1952 indicated that a cancer/asbestos relationship might exist in experimental animals, these Q.A.M.A. members refused to further fund the study and it was terminated and never publicly discussed;

(k).    As a result of the termination of this study, these Defendants fraudulently withheld information from the public and affirmatively misrepresented to the public and

responsible legislative and regulatory bodies that asbestos did not cause cancer, including affirmative misrepresentations by conspirators' agents K.W. Smith, M.D., Paul Cartier, M.D., A.J. Vorwald, M.D., A.J. Lanza, M.D., Vandiver Brown and Ivan Sabourin, said misrepresentations being directed to inter alia, U.S. government officials, Canadian government officials, U.S. National Cancer Institute, other medical organizations and the general public, including the Plaintiff;

(l). Subsequently, the Q.A.M.A. Defendant conspirators contracted with the Industrial Hygiene Foundation and Dr. Daniel Braun to further study the relationship between asbestos exposure, asbestosis and lung cancer. In 1957, Drs. Braun and Truan reported to the Q.A.M.A. that asbestosis did increase a worker's chances of incurring lung cancer;

(m). The Q.A.M.A. Defendant conspirators/members thereafter caused, in 1958, a publication of the work by Braun and Truan in which the findings regarding increased incidence of cancer in persons with asbestosis was edited out by agents of the Q.A.M.A. The published version of this study contained a conclusion that asbestos exposure, alone, did not increase the incidence of lung cancer, a conclusion known by the Defendant conspirators to be patently false;

(n). By falsifying and causing publication of studies concluding that asbestos exposure did not cause lung cancer and simultaneously omitting a documented finding that asbestosis did increase the risk of lung cancer, these Q.A.M.A. Defendant conspirators affirmatively misrepresented to the public and concealed from the public the extent of risks associated with inhalation of asbestos fibers;

(o). In approximately 1958, these Q.A.M.A. Defendant conspirators publicized the edited works of Drs. Braun and Truan at a symposium in an effort to fraudulently misrepresent to the public and persons exposed to asbestos that the inhalation of asbestos dust

26

would not cause cancer;

(p).    The fraudulent misrepresentations beginning in 1946 as elaborated above and continuing with the publication of the 1958 Braun/Truan Study influenced the standards set for threshold limit values for development of such standards to fail to lower the threshold limit value because of a cancer risk associated with asbestos inhalation;

(q).    In 1967, Q.A.M.A. Conspirators determined at their trade association meeting that they would intentionally mislead consumers about the extent of risks involved in inhalation of asbestos-containing products;

(r).    In 1952, a symposium regarding the health effects of asbestos was held at the Saranac Laboratories.  The following conspirators were in attendance:  Johns-Manville, Turner & Newall, Raybestos-Manhattan, and Q.A.M.A. members by way of their agents, Cartier, Sabourin and LaChance;

(s).    At this meeting, the occurrence of lung cancer and asbestosis in product users was discussed and the carcinogenic property of all fiber types of asbestos was also discussed.  In an affirmative attempt to mislead the public about the extent of health risks associated with asbestos, and in an effort to fraudulently conceal those risks from the public, these Defendants conspired to prevent publication of the record of this 1952 Saranac Symposium and it was not published.  In addition, the conspirators induced Vorwald not to announce the results of his and Gardner's animal studies showing excess cancers in animals which thereby fraudulently misrepresented existing secret data which could not be publicized owing to the secrecy provisions contained in the 1936 Saranac agreement heretofore described;

(t).    The following conspirators were members of the Magnesia Insulation Manufacturers Association:  Philip-Carey Corporation (predecessor to Celotex) and Johns-Manville;

27

(u).     In 1955, these conspirators caused to be published the MIMA 85% Magnesia Insulation Manual. This manual falsely and fraudulently misrepresented that asbestos-containing products offered no hazard to workers who used these products;

(v).     The following conspirators were members of the trade organization known as the Asbestos Textile Institute (ATI): Raybestos-Manhattan, Johns-Manville, H.K. Porter, Keasby & Mattison, individually and through its alter ego Turner & Newall, and National Gypsum;

(w).     In 1947, these conspirators, members of the ATI, received a report from W.C.L. Hemeon regarding asbestosis which suggested re-evaluation of the then-existing threshold limit values for asbestos exposure. These Defendants caused this report not to be published and thereby fraudulently concealed material facts about asbestos exposure from the public and affirmatively misrepresented to the public and class of persons exposed to asbestos that the existing threshold limit value was acceptable. Thereafter, these Defendant conspirators withheld additional material information on the dust standards from the American Conference of Governmental Industrial Hygienists (ACGIH), thereby further influencing evaluations of threshold limit values for asbestos exposure;

(x).     In 1953, conspirator National Gypsum, through its agents, in response to an inquiry from the Indiana Division of Industrial Hygiene regarding health hazards of asbestos spray products, refused to mail a proposed response to that division indicating that respirators should be worn by applicators of the products. National Gypsum's response distorted and fraudulently misrepresented the need for applicators of asbestos spray products to wear respirators and fraudulently concealed from such applicators the need for respirators;

(y).     In 1955, conspirator Johns-Manville, through its agent Kenneth Smith, caused to be published in AMA Archives of Industrial Health, an article entitled "Pulmonary

28

Disability in Asbestos Workers". This published study materially altered the results of an earlier study in 1949 concerning the same set of workers. This alteration of Dr. Smith's study constituted a fraudulent and material misrepresentation about the extent of the risk associated with asbestos inhalation;

(z).    In 1955, the National Cancer Institute held a meeting at which conspirator Johns-Manville, individually and as an agent for other alleged co-conspirators and A. Vorwald, as agent of co-conspirators, affirmatively misrepresented that there were no existing animal studies concerning the relationship between asbestos exposure and cancer, when, in fact, the conspirators were in secret possession of several studies which demonstrated that positive evidence did exist;

(aa).   In 1957, these conspirators, members of the ATI, jointly rejected a proposed research study on cancer and asbestos and this resulted in fraudulently concealing from the public material facts regarding asbestos exposure and also constituted an affirmative misrepresentation of then-existing knowledge about asbestos exposure and lung cancer;

(bb).   In 1964, conspirators who were members of the ATI met to formulate a plan for rebutting the association between lung cancer and asbestos exposure that had been recently discussed by Dr. Irving J. Selikoff. Thereafter, these members of the ATI embarked upon a campaign to further misrepresent the association between asbestos exposure and lung cancer;

(cc).   In 1970, through their agents, Defendants the Celotex Corporation and Carey-Canada affirmatively misrepresented that they had been in the asbestos business since 1918 and found no reported conditions of asbestosis or lung disease. This constituted a fraudulent misrepresentation about the material facts known to these Defendants; and

(dd).   All conspirators identified above approved and ratified and furthered the

previous conspiratorial acts of conspirators Johns-Manville, Raybestos Manhattan and A.J. Lanza, acting on behalf of Metropolitan Life Insurance Company, and all alleged co-conspirators during the dates and circumstances alleged above acted as agents and co-conspirators for the other conspirators.

28.    All conspirators identified above are liable for civil aiding and abetting in that they failed to warn the Plaintiff JAMES EDWARD MOORE of the dangers of exposure to asbestos while acting in concert with one another and/or pursuant to a common plan to actively conceal such dangers and the conspirators knew that their conduct would result in the Plaintiff JAMES EDWARD MOORE breathing asbestos dust, fibers and/or particles without the knowledge that such exposure could foreseeably result in harm.

29.    The Plaintiff reasonably and in good faith relied upon the fraudulent misrepresentations, omissions, and concealments made by the Defendants individually, jointly, and in conspiracy with each other, regarding the safe nature of their asbestos-containing products, which reliance resulted in illness, injuries and ultimately may cause death to JAMES EDWARD MOORE. Specifically:

(a).    The material published or caused to be published by the Defendants was false and incomplete in that the Defendants knowingly and deliberately deleted references to the known health hazards of asbestos and asbestos-containing products;

(b).    The Defendants individually, as members of a conspiracy, and as agents of other co-conspirators, intended that the publication of false and misleading reports and/or the nondisclosure of documented reports of the health hazards of asbestos;

(1).    maintain a favorable atmosphere for the continued sale and distribution of asbestos and asbestos-containing products;

(2).    assist in the continued pecuniary gain of the Defendants through

the sale of their products;

        (3).    influence in the Defendants' favor proposed legislation to regulate asbestos exposure; and

        (4).    provide a defense in law suits brought for injury resulting from asbestos disease.

        (c).    The Plaintiff JAMES EDWARD MOORE reasonably relied upon the published medical and scientific data documenting the purported safety of asbestos and asbestos-containing products, and the absence of published medical and scientific reports on the hazards of asbestos and asbestos-containing products to continue him exposure to asbestos because he believed it to be safe;

        (d).    The Defendants individually, as members of a conspiracy, and as agents of other co-conspirators intended that the Plaintiff JAMES EDWARD MOORE rely upon the published reports regarding the safety of asbestos and asbestos-containing products and upon the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-containing products, to continue his exposure to those products;

        (e).    The Defendants individually, as members of a conspiracy, and as agents of other co-conspirators were and are in a position of superior knowledge regarding the health hazards of asbestos and therefore the Plaintiff JAMES EDWARD MOORE had a right to rely on the published reports commissioned by the Defendants regarding the health hazards of asbestos and the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-containing products; and

        (f).    As a direct and proximate result of the acts alleged herein the Plaintiff JAMES EDWARD MOORE suffers damages as described in Court IV.

    30.    The Defendants' foregoing acts, failures and/or omissions were willful or wanton

in nature, were undertaken with actual or constructive knowledge that injury would result, and/or were accomplished with such recklessness as to evince a conscious disregard for the health, safety, and rights of JAMES EDWARD MOORE.

(Space Intentionally Blank)

## COUNT IV - CONCLUSION

31.    The Plaintiff hereby incorporates by reference Paragraphs One (1) through Thirty-One (31), inclusive, as if the same were hereto set forth at length.

32.    As a direct and proximate result of the negligence, carelessness, gross negligence, willful misconduct, breach of warranty, fraudulent concealment, misrepresentations and willful omissions of the Defendants, the Plaintiff JAMES EDWARD MOORE was caused to contract malignant mesothelioma which have caused JAMES EDWARD MOORE pain, suffering, mental anguish and ultimately may cause his death.  In addition, JAMES EDWARD MOORE:

(a).    Has been obliged to spend various sums of money to treat his diseases and injuries; and may be obliged to continue to do so in the future;

(b).    Has sustained a loss of earnings and earning capacity;

(c).    Has had his enjoyment of life impaired;

(d).    Has had his life expectancy shortened; and

(e).    Has been caused to suffer great psychic trauma including cancer phobia.

33.    Any delay in filing the Plaintiff's causes of action is a direct and proximate result of the Defendants' failure to warn the fraudulent concealment hereinafter described.

(a).    For a long time, the Defendants have known of the hazards of asbestos inhalation and ingestion and had the duty to warn foreseeable users like the Plaintiff and/or others similarly employed, of the hazards of their asbestos products.  However, the Defendants intentionally and fraudulently concealed said knowledge from the Plaintiff and/or others similarly employed resulting in the failure of the Plaintiff to discover the facts which are the basis of his causes of action despite the exercise of due diligence on behalf of the Plaintiff. Accordingly, any attempt on the part of any Defendant to complain about the timeliness of the commencement of Plaintiff's causes of action should be estopped.

WHEREFORE, Plaintiff prays for judgment against the Defendants, individually and jointly and severally, for compensatory damages in the sum of TWENTY MILLION DOLLARS ($20,000,000.00) and punitive damages in the sum of THREE HUNDRED FIFTY THOUSAND DOLLARS ($350,000.00), together with interest from the date of diagnosis of asbestos-induced disease plus costs of this suit and such other and further relief as is just and proper.

Respectfully submitted,

By _____
Of Counsel

Robert R. Hatten, Esquire (VSB No. 12854)
Donald N. Patten, Esquire (VSB No. 06869)
Hugh B. McCormick, III, Esquire (VSB No. 37513)
William W. C. Harty, Esquire (VSB No. 45447)
Jennifer W. Stevens, Esquire (VSB No. 43275)
Erin E. Jewell, Esquire (VSB No. 71082)
F. Alex Coletrane, Esquire (VSB No. 78381)
PATTEN, WORNOM, HATTEN
        & DIAMONSTEIN, L.C.
12350 Jefferson Avenue, Suite 300
Newport News, VA 23602
Telephone (757) 223-4500
Facsimile (757) 249-3242
rrhatten@pwhd.com
pleadings@pwhd.com

PLAINTIFF DEMANDS A JURY WITH RESPECT TO ALL ISSUES
TO WHICH HE IS ENTITLED BY LAW TO A JURY.